REVISED April 29, 2013

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 25, 2012

Lyle W. Cayce
Clerk

No. 11-10959

NATIONAL RIFLE ASSOCIATION, INCORPORATED; ANDREW M. PAYNE; REBEKAH JENNINGS; BRENNAN HARMON,

Plaintiffs–Appellants

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; B. TODD JONES, In His Official Capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives; ERIC H. HOLDER, JR., U.S. ATTORNEY GENERAL,

Defendants–Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before KING, PRADO, and HAYNES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal concerns the constitutionality of 18 U.S.C. §§ 922(b)(1) and (c)(1), and attendant regulations, which prohibit federally licensed firearms dealers from selling handguns to persons under the age of 21. Appellants—the National Rifle Association and individuals who at the time of filing were over the age of 18 but under the age of 21—brought suit in district court against several federal government agencies, challenging the constitutionality of the laws. The

essence of their challenge is that the laws violate the Second Amendment and the equal protection component of the Fifth Amendment by preventing law-abiding 18-to-20-year-old adults from purchasing handguns from federally licensed dealers. The district court rejected their constitutional claims and granted summary judgment for the government. We AFFIRM.

## I. Background

### A. Procedural Background

Appellants filed suit in district court against the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), ATF's Acting Director, and the Attorney General of the United States, challenging the constitutionality of 18 U.S.C. §§ 922(b)(1) and (c)(1), as well as attendant regulations, 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b). These provisions prohibit licensed dealers—i.e., federal firearms licensees ("FFLs")—from selling handguns to persons under the age of 21. Appellants include: (i) Andrew M. Payne, Rebekah Jennings, and Brennan Harmon, who were between the ages of 18 and 21 when the suit was filed; and (ii) the National Rifle Association ("NRA") on behalf of (a) 18-to-20-year-old members who are prevented from purchasing handguns from FFLs, and (b) FFL members who are prohibited from making such sales. Appellants asserted that the federal laws are unconstitutional because they infringe on the right of 18-to-20-year-old adults to keep and bear arms under the Second Amendment and deny them equal protection under the Due Process Clause of the Fifth Amendment. Appellants sought a declaratory judgment that the laws are unconstitutional, as well as injunctive relief.

Before the district court, the government filed a motion for summary judgment, arguing that Appellants lacked standing to challenge the federal laws and that their constitutional claims failed on the merits. The district court concluded that Appellants had standing, but then determined that Appellants

failed to make out either a viable Second Amendment claim or a viable equal protection claim. Appellants timely appealed.

B.  Statutory Framework

The federal laws at issue—18 U.S.C. §§ 922(b)(1) and (c)(1), 27 C.F.R. §§ 478.99(b)(1), 478.124(a), and 478.96(b)—were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197. Together, the laws regulate the sale of firearms by FFLs and are part of a larger statutory package that prohibits persons from "engag[ing] in the business of importing, manufacturing, or dealing in firearms," unless a person is a "licensed importer, licensed manufacturer, or licensed dealer." 18 U.S.C. § 922(a)(1)(A). To "engage[] in th[is] business" means to "devote[] time, attention, and labor" to the manufacture, sale, or importation of firearms or ammunition "as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Id. § 921(21)(A)–(E).

The first contested provision, 18 U.S.C. § 922(b)(1), provides that:

It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age . . . .

This provision is paired with § 922(c)(1), which prevents an FFL from selling a firearm to a person "who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer)" unless the person submits a sworn statement that "in the case of any firearm other than a shotgun or a rifle, [he or she is] twenty-one years or more of age."

These provisions are the statutory authority for several implementing regulations that Appellants also contest. First, 27 C.F.R. § 478.99(b)(1) provides that an FFL

> shall not sell or deliver . . . any firearm or ammunition to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 18 years of age, and, if the firearm, or ammunition, is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age.

Second, 27 C.F.R. §§ 478.96(b) and 478.124(a) prohibit FFLs from selling firearms unless they obtain a signed copy of Form 4473 from the purchaser. Form 4473 is used, among other purposes, to establish a purchaser's eligibility to possess a firearm by establishing his or her date of birth. Id. § 478.124(c)(1). It also requires the execution and dating of a sworn statement indicating that if "the firearm to be transferred is a firearm other than a shotgun or rifle, the transferee is 21 years or more of age." Id. § 478.124(f).

Congress later supplemented this regulatory scheme with the Violent Crime Control and Law Enforcement Act of 1994, which prohibits persons under the age of 18 from possessing handguns and bars the transfer of handguns to them, with limited exceptions. Pub. L. No. 103-322, § 110201, 108 Stat. 1796, 2010 (adding 18 U.S.C. § 922(x)). The parties agree that the network of federal laws amounts to the following. Eighteen-to-twenty-year-olds may possess and use handguns. Parents or guardians may gift handguns to 18-to-20-year-olds.[1]

---

[1] See, e.g., S. Rep. No. 90-1097, at 79 (1968) ("[A] minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian."); accord S. Rep. No. 89-1866, at 58 (1966). As explained infra, Section III.B, "minor" in the 1968 Act refers to a person under the age of 21, while "juvenile" refers to a person under the age of 18.

The government also points the court to an ATF Chief Counsel Opinion, which advises—in response to a private inquiry—that an FFL may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor provided that the minor is not otherwise

Those not "engaged in the business" of selling firearms—that is, non-FFLs—may sell handguns to 18-to-20-year-olds; put differently, 18-to-20-year-olds may acquire handguns through unlicensed, private sales.[2] Eighteen-to-twenty-year-olds may possess and use long-guns, and may purchase long-guns from FFLs (or non-FFLs).[3] However, the parties also agree that 18-to-20-year-olds may not purchase handguns from FFLs. Appellants challenge 18 U.S.C. §§ 922(b)(1) and (c)(1), and corresponding regulations, only to the extent that these laws prohibit sales of handguns or handgun ammunition by FFLs to 18-to-20-year-olds.[4]

---

prohibited from receiving or possessing a firearm. Letter from Daniel Hartnett, Asst. Dir., Criminal Enforcement, ATF, to Sig Shore, 23362 (Dec. 5, 1983).

[2] The term "engaged in the business" of dealing in firearms does "not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Furthermore, 18 U.S.C. § 922(a)(6), which proscribes making a false statement to an FFL while purchasing a firearm, functions as an outer limit on the extent to which a person under 21 may use "straw men" to purchase a firearm. See United States v. Bledsoe, 334 F. App'x 711 (5th Cir. 2009) (unpublished) (affirming conviction of under-21 defendant who admitted to paying a third party to purchase a handgun from FFL when third party stated to the FFL that he was the "actual buyer" of the gun).

[3] See 18 U.S.C. § 922(b)(1) (stating that FFL may sell "shotgun or rifle" to person under 21).

[4] Most of the States have gone beyond the federal floor. Today, all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms. Twenty-nine States (and the District of Columbia) impose a minimum-age qualification only on the purchase or use of handguns. Many States (and the District of Columbia) proscribe or restrict the sale of handguns to persons under 21 (by non-FFLs) or the possession of handguns by persons under 21. See, e.g., California (Cal. Penal Code § 27505); Connecticut (Conn. Gen. Stat. §§ 29-34(b), 29-36f); Delaware (Del. Code Ann. tit. 24, §§ 901, 903); District of Columbia (D.C. Code Ann. §§ 7-2502.03, 22-4507); Hawaii (Haw. Rev. Stat. § 134-2(d)); Illinois (430 Ill. Comp. Stat. §§ 65/3(a), 65/4(a)(2)(i)); Iowa (Iowa Code Ann. § 724.22); Maryland (Md. Code Ann., Pub. Safety §§ 5-101(p), 5-133, 5-134); Massachusetts (Mass. Gen. Laws ch. 140, § 130); New Jersey (N.J. Stat. Ann. § 2C:58-6.1); Ohio (Ohio Rev. Code Ann. § 2923.211(B)); Rhode Island (R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-37); see also New York (N.Y. Penal Law §400.00(1)(a)).

## II. Standing

### A. Applicable Law

We review questions of standing de novo. Time Warner Cable, Inc. v. Hudson, 667 F.3d 630, 635 (5th Cir. 2012). The parties seeking access to federal court bear the burden of establishing their standing. Id. "[T]he irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The first is an "injury in fact," which is a "concrete and particularized . . . invasion of a legally protected interest." Id. (citations omitted). The second is that "there must be a causal connection between the injury and the conduct complained of[;] the injury has to be fairly . . . trace[able] to the challenged action of the defendant." Id. (second alteration in original) (citation and quotation marks omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (citation and internal quotation marks omitted). Only injury-in-fact is at issue in this appeal.

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008) (citations omitted). Mootness, however, is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980) (citation omitted). When "named plaintiffs will not benefit from a favorable ruling on the question implicating injunctive relief, we hold that th[e] question is moot as to them." Pederson v. La. State Univ., 213 F.3d 858, 874 (5th Cir. 2000).

Under the doctrine of associational standing, an association may have standing to bring suit on behalf of its members when:

[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd., 627 F.3d 547, 550 (5th Cir. 2010) (citation omitted). The first prong requires that at least one member of the association have standing to sue in his or her own right. Tex. Democratic Party v. Benkiser, 459 F.3d 582, 587–88 (5th Cir. 2006).

B.    Application

Before oral argument in this case, counsel for Appellants notified us that Rebekah Jennings and Brendan Harmon had turned 21. Because they have aged out of the demographic group affected by the ban at bar, the issues on appeal are moot as to them. See Pederson, 213 F.3d at 874. Andrew Payne, the third individual Appellant, will remain under the age of 21 throughout the appeal. Mootness does not affect his claim. In addition, the NRA has asserted associational standing on behalf of its members who are between the ages of 18 and 21. The NRA submitted a sworn declaration that it had over 11,000 members who would be covered by the ban, and NRA members between the ages of 18 and 21 submitted sworn declarations that they cannot purchase handguns from FFLs because of the ban. However, the government contends that Payne and the NRA's under-21 members have not suffered an injury-in-fact.

We disagree and hold that Payne and the NRA, on behalf of its under-21 members, have standing to bring this suit. The government is correct that the challenged federal laws do not bar 18-to-20-year-olds from possessing or using handguns. The laws also do not bar 18-to-20-year-olds from receiving handguns from parents or guardians. Yet, by prohibiting FFLs from selling handguns to 18-to-20-year-olds, the laws cause those persons a concrete, particularized injury—i.e., the injury of not being able to purchase handguns from FFLs. See

Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 750–57, 755 n.12 (1976) (finding standing for prospective customers to challenge constitutionality of state statute prohibiting pharmacists from advertising prescription drug prices, despite customers' ability to obtain price quotes in another way—over the phone from some pharmacies).[5]

Standing may be satisfied by the presence of "at least one individual plaintiff who has demonstrated standing to assert the[] [contested] rights as his own." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 (1977); see also Horne v. Flores, 557 U.S. 433, 446–47 (2009). Having established Payne's standing and the NRA's associational standing on behalf of its 18-to-20-year-olds members, we need not discuss the NRA's associational standing on behalf of its FFL members. We therefore proceed to the merits of this appeal.

III. Second Amendment Claim

The crux of Appellants' position on the merits is that the federal ban at bar violates their rights under the Second Amendment, given the holding in District of Columbia v. Heller, 554 U.S. 570 (2008). Appellants urge that, by preventing an 18-to-20-year-old from purchasing handguns from FFLs, the laws impermissibly infringe on that individual's right under the Second Amendment to keep and bear arms. The district court granted summary judgment for the government, rejecting the Second Amendment claim. We review the constitutionality of federal statutes de novo. United States v. Portillo–Munoz, 643 F.3d 437, 439 (5th Cir. 2011).

---

[5] This injury is fairly traceable to the challenged federal laws, and holding the laws unconstitutional would redress the injury. See Lujan, 504 U.S. at 560. Therefore, Payne has standing to challenge the laws, and the 18-to-20-year-old NRA members have standing to sue in their own right. The NRA, in turn, has associational standing to sue on behalf of these members because (i) they have standing to sue in their own right, (ii) challenging laws preventing 18-to-20-year-olds from purchasing handguns from FFLs is germane to the NRA's purpose of safeguarding the right of law-abiding, qualified adults to keep and bear arms, and (iii) no "factual development" about the 18-to-20-year-old NRA members is necessary to evaluate the claim asserted or the relief requested. See Am. Physicians, 627 F.3d at 550–53.

No other circuit court has considered the constitutionality of the challenged federal laws in light of Heller. Only a single district court has considered the constitutionality of the ban, upholding it under intermediate scrutiny. See United States v. Bledsoe, No. SA-08-CR-13(2)-XR, 2008 WL 3538717, at *4 (W.D. Tex. Aug. 8, 2008). We affirmed the defendant's conviction in that case without reaching the constitutional issue. See United States v. Bledsoe, 334 F. App'x 711 (5th Cir. 2009) (unpublished). Consequently, this is an issue of first impression in this circuit. Because we—unlike some of our fellow circuit courts—have yet to establish a framework for evaluating post-Heller Second Amendment challenges, we sketch a framework here.

## A.    Analytical Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In Heller, the Supreme Court made clear that the Second Amendment codified a pre-existing individual right to keep and bear arms. 554 U.S. at 592, 595. In McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), the Court further clarified that "the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," and is incorporated against the States via the Fourteenth Amendment. Id. at 3042.

The precise question before the Court in Heller was whether Washington, D.C. statutes banning the possession of usable handguns in the home—in addition to requiring residents to keep their firearms either disassembled or trigger locked—violated the Second Amendment. 554 U.S. at 573–75. The Court invalidated the laws because they violated the central right that the Second Amendment was intended to protect—that is, the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635 (emphasis added); see also id. at 628–30 (distilling the Second Amendment to its "core" interest of "self-defense" and the "protection of one's home and family").

9

Indeed, the ban on home handgun possession squarely struck the core of the Second Amendment—a rare feat, as the Court observed that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." Id. at 629. The Court thus noted that the ban "would fail constitutional muster" under "any of the standards of scrutiny" applicable to "enumerated constitutional rights." Id. at 628–29.

In a critical passage, moreover, the Court emphasized that the "right secured by the Second Amendment is not unlimited." Id. at 626. As the Court explained:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626–27 (emphases added) (citations omitted). The Court hastened to add that it had listed "these presumptively lawful regulatory measures only as examples"; the list was illustrative, "not exhaustive." Id. at 627 n.26.[6]

Understandably, the Court did not undertake an "exhaustive historical analysis . . . of the full scope of the Second Amendment." Id. at 626; see also id.

---

[6] The Court's decision to repeat this passage in McDonald underscores its importance: "We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. We repeat those assurances here." 130 S. Ct. at 3047 (citation and internal quotation marks omitted).

at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."). Instead, the Court identified the Second Amendment's central right as the right to defend oneself in one's home, and concluded that an absolute ban on home handgun possession—a gun-control law of historic severity—infringed the Second Amendment's core. In so doing, Heller did not set forth an analytical framework with which to evaluate firearms regulations in future cases. Nor has this court, since Heller, explained how to determine whether the federal laws at bar comport with the Second Amendment.[7]

But our fellow courts of appeals have filled the analytical vacuum. A two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny. See United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (Heller II); Ezell v. City of Chicago, 651 F.3d 684, 701–04 (7th Cir. 2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800–01 (10th Cir. 2010) United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010). But see United States v. Skoien, 614 F.3d 638, 641–42 (7th Cir. 2011) (en banc) (eschewing the two-step framework and resisting the "levels of scrutiny

---

[7] Since Heller, we have upheld several federal statutes against Second Amendment challenges, but we have not established a Second Amendment framework. See, e.g., Portillo–Munoz, 643 F.3d at 439–42 (upholding 18 U.S.C. § 922(g)(5), which prevents illegal aliens from possessing firearms); United States v. Anderson, 559 F.3d 348, 352 (5th Cir. 2009) (upholding § 922(g), which bars convicted felons from possessing firearms, based on circuit precedent); United States v. Dorosan, 350 F. App'x 874, 875–76 (5th Cir. 2009) (unpublished) (upholding regulation barring possession of handguns on U.S. Postal Service property).

quagmire," but applying intermediate scrutiny to a categorical restriction). We adopt a version of this two-step approach and sketch a skeleton of the framework here, leaving future cases to put meat on the bones.

We agree that the first inquiry is whether the conduct at issue falls within the scope of the Second Amendment right. See, e.g., Chester, 628 F.3d at 680. To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee. See Heller, 554 U.S. at 577–628 (interpreting Second Amendment based on historical traditions); United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) ("[H]istorical meaning enjoys a privileged interpretive role in the Second Amendment context."). Heller illustrates that we may rely on a wide array of interpretive materials to conduct a historical analysis. See 554 U.S. at 600–26 (relying on courts, legislators, and scholars from before ratification through the late 19th century to interpret the Second Amendment); see also United States v. Rene E., 583 F.3d 8, 13–16 (1st Cir. 2009) (relying on wide-ranging materials, including late 19th- and early 20th-century cases, to uphold federal ban on juvenile handgun possession).[8]

If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster. See, e.g., Marzzarella, 614 F.3d at 89. If the law burdens conduct that falls within the

---

[8] In exploring the "historical understanding of the scope of the right," 554 U.S. at 625, the Heller Court looked to a "variety of legal and other sources to determine the public understanding of [the] legal text in the period after its enactment or ratification," id. at 605 (emphasis omitted). These sources included "analogous arms-bearing rights," id. at 600, adopted by states "[b]etween 1789 and 1820," id. at 602, and the interpretation of these provisions by "19th-century courts and commentators," id. at 603. The Heller Court also looked to "[p]ost-Civil War [l]egislation," reasoning that because "those born and educated in the early 19th century faced a widespread effort to limit arms ownership by a large number of citizens[,] their understanding of the origins and continuing significance of the Amendment is instructive." Id. at 614.

Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny. See id.

We agree with the prevailing view that the appropriate level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." See Chester, 628 F.3d at 682 (observing that a "severe burden on the core Second Amendment right of armed self-defense should require a strong justification," but "less severe burdens on the right" and "laws that do not implicate the central self-defense concern of the Second Amendment[] may be more easily justified" (quotation and citation omitted)); accord Heller II, 670 F.3d at 1257 ("[A] regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify."); Masciandaro, 638 F.3d at 470 (observing that the analysis turns on "the character of the Second Amendment question presented"—that is, "the nature of a person's Second Amendment interest [and] the extent to which those interests are burdened by government regulation"). A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family, see Heller, 554 U.S. at 635—triggers strict scrutiny. See Heller II, 670 F.3d at 1257; Masciandaro, 638 F.3d at 470; Chester, 628 F.3d at 682. A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing. See Heller II, 670 F.3d at 1257; Masciandaro, 638 F.3d at 470; Chester, 628 F.3d at 682. This more lenient level of scrutiny could be called "intermediate" scrutiny, but regardless of the label, this level requires the government to demonstrate a "reasonable fit" between the challenged regulation and an "important" government objective. See Marzzarella, 614 F.3d at 98; accord Chester, 628 F.3d at 683; see also

Masciandaro, 638 F.3d at 471 (stating that intermediate scrutiny requires government to demonstrate that the regulation is "reasonably adapted to a substantial governmental interest"). This "intermediate" scrutiny test must be more rigorous than rational basis review, which Heller held "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right" such as "the right to keep and bear arms." See 554 U.S. at 628 n.27; see also id. ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

We admit that it is difficult to map Heller's "longstanding," id. at 626, "presumptively lawful regulatory measures," id. at 627 n.26, onto this two-step framework. It is difficult to discern whether "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . or laws imposing conditions and qualifications on the commercial sale of arms," id. at 626–27, by virtue of their presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny. See, e.g., Marzzarella, 614 F.3d at 91 (recognizing that the designation—longstanding, presumptively lawful measure—is ambiguous). For now, we state that a longstanding, presumptively lawful regulatory measure—whether or not it is specified on Heller's illustrative list—would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework. See Heller II, 670 F.3d at 1253 ("[A] regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation

by the Second Amendment.").[9] We further state that a longstanding measure that harmonizes with the history and tradition of arms regulation in this country would not threaten the core of the Second Amendment guarantee. Thus, even if such a measure advanced to step two of our framework, it would trigger our version of "intermediate" scrutiny. See Masciandaro, 638 F.3d at 470–71 (applying intermediate scrutiny to and upholding federal regulation banning possession of loaded handgun in motor vehicle within a national park, and reasoning that the "longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable").

In addition, Heller demonstrates that a regulation can be deemed "longstanding" even if it cannot boast a precise founding-era analogue. See Skoien, 614 F.3d at 640–41 ("[W]e do take from Heller the message that exclusions need not mirror limits that were on the books in 1791."); cf. Heller II, 670 F.3d at 1253–54 (relying on early 20th-century state statutes to show that D.C. handgun registration requirement was "longstanding" and did not "impinge upon the right protected by the Second Amendment"). After all, Heller considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage. See Booker, 644 F.3d at 23–24 (explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), "bears little resemblance to laws in effect at the time the Second Amendment was ratified," as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968); Skoien, 614 F.3d at 640–41 (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a

---

[9] The Heller Court assured that "nothing in [its] opinion should be taken to cast doubt on" longstanding, presumptively lawful measures. 554 U.S. at 626. The Court also compared its list of longstanding, presumptively lawful measures with the restriction on possessing dangerous and unusual weapons, which conduct—the Court explained—fell outside the scope of the Second Amendment right. Id. at 626–27.

person who has been adjudicated to be mentally ill, was enacted in 1968); Carlton F. W. Larson, Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1376–80 (2009) (showing that a strictly originalist argument for Heller's examples—including bans on firearm possession by felons and the mentally ill, and laws imposing conditions on commercial arms sales—is difficult to make).

Having sketched our two-step analytical framework, we must emphasize that we are persuaded to adopt this framework because it comports with the language of Heller. As for step one, Heller itself suggests that the threshold issue is whether the party is entitled to the Second Amendment's protection. See 554 U.S. at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun . . . ."); see also id. at 626–27 (providing a non-exhaustive list of longstanding, presumptively lawful regulatory measures). As for step two, by taking rational basis review off the table, and by faulting a dissenting opinion for proposing an interest-balancing inquiry rather than a traditional level of scrutiny, the Court's language suggests that intermediate and strict scrutiny are on the table. See id. at 628 n.27; id. at 634 ("[Justice Breyer] proposes . . . none of the traditionally expressed levels (strict scrutiny, intermediate scrutiny, rational basis), but rather a judge-empowering 'interest-balancing inquiry' . . . ." (emphasis added) (quoting id. at 689 (Breyer, J., dissenting))). The Court's use of the word "rather" demonstrates that, in the Court's view, the familiar scrutiny tests are not equivalent to interest balancing. In rejecting Justice Breyer's proposed interest-balancing inquiry, we understand the Court to have distinguished that inquiry from the traditional levels of scrutiny; we do not understand the Court to have rejected all heightened scrutiny analysis. But see Heller II, 670 F.3d at 1277–78 (Kavanaugh, J. , dissenting) (arguing that the Heller Court's rejection of Justice Breyer's interest-balancing inquiry amounted to a rejection of all

16

balancing tests).[10] At the very least, the Court did not expressly foreclose intermediate or strict scrutiny, but instead left us room to maneuver in crafting a framework.

Furthermore, we are persuaded to adopt the two-step framework outlined above because First Amendment doctrine informs it. See Marzzarella, 614 F.3d at 89 n.4 (looking toward the First Amendment for guidance in interpreting the Second Amendment and observing that "Heller itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment"). First, First Amendment doctrine supports commencing our analysis with a threshold inquiry into whether the Second Amendment protects the conduct at issue. Similar to the first step of our Second Amendment framework, the first step in analyzing a First Amendment challenge is to determine whether the conduct (i.e., speech) in question is protected. See Ashcroft v. Free Speech Coal., 535 U.S. 234, 245–46 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children."). Second, First Amendment doctrine demonstrates that, even with respect to a fundamental constitutional right, we can and should adjust the level of scrutiny according to the severity of the challenged regulation. See Marzzarella, 614 F.3d at 96–97 ("[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see no reason why the Second Amendment would be any different." (citation omitted)); Justice For All v. Faulkner, 410 F.3d 760, 765–66 (5th Cir. 2005) (discussing different levels of

---

[10] We are further convinced that intermediate and strict scrutiny are on the table by the Court's statement that the handgun ban in Heller would be unconstitutional "[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights." Heller, 554 U.S. at 628–29. We reason that, had the Court so intended, it would have expressly rejected application of any form of heightened scrutiny. See Heller II, 670 F.3d at 1265.

scrutiny for traditional, nonpublic, and designated fora); see also Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989) (applying intermediate scrutiny to commercial speech in light of its "subordinate position in the scale of First Amendment values"); Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restrictions on speech); Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist., 579 F.3d 502, 510–12 (5th Cir. 2009) (reviewing school dress codes under intermediate scrutiny). Thus, even though the Second Amendment right is fundamental, McDonald, 130 S. Ct. at 3042, we reject the contention that every regulation impinging upon the Second Amendment right must trigger strict scrutiny. See Heller II, 670 F.3d at 1256 ("The [Supreme] Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake."); Chester, 628 F.3d at 682 ("We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights."); Adam Winkler, Scrutinizing the Second Amendment, 105 Mich. L. Rev. 683, 697–98 (2007) (observing that "[i]t simply is not true that every right deemed 'fundamental' triggers strict scrutiny," and that "[e]ven among those incorporated rights that do prompt strict scrutiny, such as the freedom of speech and of religion, strict scrutiny is only occasionally applied"). In harmony with well-developed principles that have guided our interpretation of the First Amendment, we believe that a law impinging upon the Second Amendment right must be reviewed under a properly tuned level of scrutiny—i.e., a level that is proportionate to the severity of the burden that the law imposes on the right.

B.    Background of the Challenged Federal Laws

Before we apply the framework described above to the challenged federal laws, we place them in context. Congress passed the Omnibus Crime Control and Safe Streets Act of 1968 following a multi-year inquiry into violent crime

that included "field investigation and public hearings." S. Rep. No. 88-1340, at 1 (1964). According to the preamble to the Act, Congress had found "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 197, 225 (1968). The preamble further declares:

> [T]he ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States.

Id. § 901(a)(2), 82 Stat. at 225; see also Huddleston v. United States, 415 U.S. 814, 824 (1974) (stating that the purpose of the 1968 Act was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency" (quoting S. Rep. No. 90-1501, at 22 (1968))).

Moreover, in a section titled "Acquisition of firearms by juveniles and minors,"[11] the Senate Report accompanying the Act provides:

> [T]he title would provide a uniform and effective means through the United States for preventing the acquisition of the specified firearms by persons under such ages. However, under the title, a minor or juvenile would not be restricted from owning, or learning the proper usage of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.

---

[11] Throughout the Act and accompanying legislative materials, the term "minor" refers to a person under the age of 21, while the term "juvenile" refers to a person under the age of 18. As explained infra, Section III.C.1, the age of majority at common law was 21, not 18. It was not until the 1970s that States lowered the age of majority to 18 for most purposes.

> The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country. The controls proposed in the title are designed to meet this problem and to substantially curtail it.

S. Rep. No. 90-1097, at 79 (1968).

Congress's investigation confirmed a "causal relationship between the easy availability of firearms other than a rifle or a shotgun and . . . youthful criminal behavior." Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 225–26; see also Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen) ("The greatest growth of crime today is in the area of young people . . . . The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly."). Having found that concealable firearms had been "widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior," Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 226, Congress concluded that "only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible," id. § 901(a)(3), 82 Stat. at 225.

The legislative record makes clear that Congress's purpose in preventing persons under 21—including 18-to-20-year-olds—from purchasing handguns from FFLs was to curb violent crime. Essentially, then, the federal laws at issue are safety-driven, age-based categorical restrictions on handgun access.

C. Whether the Challenged Federal Laws Burden Conduct Protected by the Second Amendment

Having placed the challenged federal laws in their proper context, we now consider whether the laws—which combine to prevent 18-to-20-year-olds from

purchasing handguns from FFLs—burden conduct that is protected by the Second Amendment.

### 1. Founding-Era Attitudes

As the Supreme Court recognized in Heller, the right to keep and bear arms has never been unlimited. 554 U.S. at 626; see also Robertson v. Baldwin, 165 U.S. 275, 281 (1897) (observing that the right to keep and bear arms, like other rights "inherited from our English ancestors" and protected by the Bill of Rights, has "from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case"). Since even before the Revolution, gun use and gun control have been inextricably intertwined. The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books; these included safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service (including laws requiring militia members to attend "musters," public gatherings where officials would inspect and account for guns), laws prohibiting the use of firearms on certain occasions and in certain places, and laws disarming certain groups and restricting sales to certain groups. See Adam Winkler, Gunfight: The Battle over the Right to Bear Arms in America 113–18 (2011); Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 502–13 (2004). It appears that when the fledgling republic adopted the Second Amendment, an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee.

Noteworthy among these revolutionary and founding-era gun regulations are those that targeted particular groups for public safety reasons. For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation. See

Cornell & DeDino, 73 Fordham L. Rev. at 507–08. Although these Loyalists were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger. Id. ("The law demonstrates that in a well regulated society, the state could disarm those it deemed likely to disrupt society."); see also Winkler, Gunfight, at 116 (concluding that "[t]he founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy," a group that included law-abiding slaves, free blacks, and Loyalists); Don B. Kates & Clayton E. Cramer, Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1360 (2009) ("[F]rom time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms. American legislators at the time of the Bill of Rights seem to have been aware of this tradition . . . ." (footnote omitted)).

In the view of at least some members of the founding generation, disarming select groups for the sake of public safety was compatible with the right to arms specifically and with the idea of liberty generally. See Saul Cornell, Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory, 16 Const. Comment. 221, 231–36 (1999) (discussing Pennsylvania Anti-Federalists' support for a high level of gun regulation). Shortly after the Pennsylvania ratifying convention for the original Constitution, for example, the Anti-Federalist minority recommended the following amendment: "That the people have a right to bear arms for the defense of themselves and their own state, or the United States . . . and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." Id. at 233 (emphasis added) (quoting The Address and

Reasons of Dissent of the Minority, in The Documentary History of the Ratification of the Constitution 588, 617–24 (St. Historical Soc'y of Wis., 1976)).[12]

These categorical restrictions may have been animated by a classical republican notion that only those with adequate civic "virtue" could claim the right to arms. Scholars have proposed that at the time of the founding, "the right to arms was inextricably and multifariously linked to that of civic virtu (i.e., the virtuous citizenry)," and that "[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue." Kates & Cramer, 60 Hastings L.J. at 1359–60.[13] This theory suggests that the Founders would have supported limiting or banning "the ownership of firearms by minors, felons, and the mentally impaired." See Don B. Kates, Second Amendment, in 4 Encyclopedia of the American Constitution 1640 (Leonard W. Levy et al. eds., 1986) (emphasis added); see also United States v. Emerson, 270 F.3d 203, 261 (5th Cir. 2001) (inferring from scholarly sources that "it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms" (emphasis added)).

---

[12] Additionally, William Rawle—"a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights," Heller, 554 U.S. at 607—maintained that although the Second Amendment restrained the power of Congress to "disarm the people," the right to keep and bear arms nonetheless "ought not, . . . in any government, to be abused to the disturbance of the public peace." William Rawle, A View of the Constitution of the United States of America 125–26 (William S. Hein & Co. 2003) (2d ed. 1829).

[13] See also Robert E. Shalhope, The Armed Citizen in the Early Republic, 49 Law & Contemp. Probs. 125, 130 (Winter 1986) ("[T]he philosophers of republicanism were not blind to the desirability of disarming certain elements within their society . . . . Arms were 'never lodg'd in the hand of any who had not an Interest in preserving the publick Peace . . . .'" (quoting J. Trenchard & W. Moyle, An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, And Absolutely Destructive to the Constitution of the English Monarchy (London 1697)).

Notably, the term "minor" or "infant"—as those terms were historically understood—applied to persons under the age of 21, not only to persons under the age of 18. The age of majority at common law was 21, and it was not until the 1970s that States enacted legislation to lower the age of majority to 18. See, e.g., Black's Law Dictionary 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority . . . ." (quoting John Indermaur, Principles of the Common Law 195 (Edmund H. Bennett ed., 1st Am. ed. 1878))); id. ("The common-law rule provided that a person was an infant until he reached the age of twenty-one. The rule continues at the present time, though by statute in some jurisdictions the age may be lower." (quoting John Edward Murray Jr., Murray on Contracts § 12, at 18 (2d ed. 1974))); see generally Larry D. Barnett, The Roots of Law, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681–86 (2007). If a representative citizen of the founding era conceived of a "minor" as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18-to-20-year-olds as "minors," then it stands to reason that the citizen would have supported restricting an 18-to-20-year-old's right to keep and bear arms.

2.     Nineteenth-Century Legislators, Courts, and Commentators

Arms-control legislation intensified through the 1800s, see Cornell & DeDino, 73 Fordham L. Rev. at 512–13, and by the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of "minors" to purchase or use particular firearms while the state age of majority was set at age 21.[14] See, e.g., State v. Quail, 92 A. 859,

---

[14] 1856 Ala. Acts 17; 16 Del. Laws 716 (1881); 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112; 1881 Ill. Laws 73; 1875 Ind. Acts 86; 1884 Iowa Acts 86; 1883 Kan. Sess. Laws 159; 1873 Ky. Acts 359; 1890 La. Acts 39; 1882 Md. Laws 656; 1878 Miss. Laws 175–76; Mo. Rev. Stat. § 1274 (1879); 1885 Nev. Stat. 51; 1893 N.C. Sess. Laws 468–69; 1856 Tenn. Pub. Acts 92; 1897 Tex. Gen. Laws 221–22; 1882 W. Va. Acts 421–22; 1883 Wis.

859 (Del. 1914) (discussing indictment for "knowingly sell[ing] a deadly weapon to a minor other than an ordinary pocket knife"); State v. Allen, 94 Ind. 441 (1884) (discussing prosecution for "unlawfully barter[ing] and trad[ing] to Wesley Powles, who was then and there a minor under the age of twenty-one years, a certain deadly and dangerous weapon, to wit: a pistol, commonly called a revolver, which could be worn or carried concealed about the person"); Tankersly v. Commonwealth, 9 S.W. 702, 702 (Ky. 1888) (discussing indictment for selling a deadly weapon to a minor); see also Rene E., 583 F.3d at 14 ("During this period and soon after, a number of states enacted similar statutes prohibiting the transfer of deadly weapons—often expressly handguns—to juveniles."). By the early 20th century, three more States restricted the purchase or use of particular firearms by persons under 21.[15] By 1923, therefore, twenty-two States and the District of Columbia had made 21 the minimum age for the purchase or use of particular firearms.[16]

Meanwhile, "19th-century courts and commentators," Heller, 554 U.S. at 603, maintained that age-based restrictions on the purchase of firearms—including restrictions on the ability of persons under 21 to purchase

---

Sess. Laws 290; 1890 Wyo. Sess. Laws 1253. Alabama, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Tennessee, Texas, and Wyoming had Second Amendment analogues in their respective constitutions at the time they enacted these regulations.

[15] Okla. Stat. ch. 25, art. 47 §§ 1-3 (1890) (though not admitted as State until 1907); 1923 N.H. Laws 138, 139; 1923 S.C. Acts 207, 221. Oklahoma and South Carolina have Second Amendment analogues in their respective constitutions.

[16] From the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms. As one early 20th century commentator wrote of the state legislation: "The acts are quite consistent in refusing to allow the issue of licenses to young persons or criminals, and in punishing persons who sell or put into possession of the forbidden classes the forbidden weapons." J. P. Chamberlain, Legislatures and the Pistol Problem, 11 A.B.A. J. 596, 598 (1925).

Today—as mentioned supra, Section I.B.—all fifty States (and the District of Columbia) have imposed minimum-age qualifications on the use or purchase of particular firearms. Thirty-five States have Second Amendment analogues in their respective constitutions.

firearms—comported with the Second Amendment guarantee. To illustrate, Thomas Cooley—a "judge and professor" "who wrote a massively popular 1868 Treatise on Constitutional Limitations," Heller, 554 U.S. at 616—agreed that "the State may prohibit the sale of arms to minors" pursuant to the State's police power. Thomas M. Cooley, Treatise on Constitutional Limitations 740 n.4 (5th ed. 1883) (citing State v. Calicutt, 69 Tenn. 714 (1878)). Cooley recognized the validity of imposing age qualifications on arm sales, despite his acknowledgment that the "federal and State constitutions provide that the right of the people to bear arms shall not be infringed." Id. at 429.

In the 1878 case that Cooley referenced, the Tennessee Supreme Court upheld a conviction under a state law making it a misdemeanor to sell, give, or loan a pistol to a minor, Calicutt, 69 Tenn. at 714–15, when the age of majority was set at 21. The defendant argued that the law violated the state's Second Amendment analogue, reasoning that because "every citizen who is subject to military duty has the right 'to keep and bear arms,' . . . this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him." Id. at 716. In rejecting the defendant's challenge, the court explained that the "wise and salutary" legislation was passed to "prevent crime" and suppress "the pernicious and dangerous practice of carrying arms," and was not "intended to affect, and [did] not in fact abridge," the right to keep and bear arms. Id. at 715–17. Likewise, in Coleman v. State, 32 Al. 581, 582–83 (1858), the Alabama Supreme Court upheld a conviction for violating a state law making it a misdemeanor to sell, give, or lend a pistol to a male minor, when the age of majority was set at 21.

### 3. Conclusion

We have summarized considerable evidence that burdening the conduct at issue—the ability of 18-to-20-year-olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition, which suggests that the

conduct at issue falls outside the Second Amendment's protection.  At a high level of generality, the present ban is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety.  See Winkler, Gunfight, at 116; Cornell & DeDino, 73 Fordham L. Rev. at 507–08.  More specifically, the present ban appears consistent with a longstanding tradition of age- and safety-based restrictions on the ability to access arms.  In conformity with founding-era thinking, and in conformity with the views of various 19th-century legislators and courts, Congress restricted the ability of minors under 21 to purchase handguns because Congress found that they tend to be relatively immature and that denying them easy access to handguns would deter violent crime.  Compare Kates & Cramer, 60 Hastings L.J. at 1360 (reflecting founding-era attitude that minors were inadequately virtuous to keep and bear arms), and Calicutt, 69 Tenn. at 716–17 (referring to prohibition on firearm sales to minors as "wise and salutary" legislation designed to "prevent crime"), with Pub. L. No. 90-351, § 901(a)(6), 82 Stat. 197, 226 (1968) (reflecting concern that handguns had been "widely sold by [FFLs] to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior").

This reasoning finds support in United States v. Rene E., in which the First Circuit canvassed sources similar to ours and upheld the constitutionality of 18 U.S.C. § 922(x), which prohibits persons under age 18 from possessing handguns and prohibits transfers of handguns to such persons, with exceptions. 583 F.3d at 16.  The court inferred that "[t]here is some evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms," and that "[i]n this sense, the federal ban on juvenile possession of handguns is part of a longstanding practice of prohibiting certain classes of individuals from possessing firearms—those whose possession poses

a particular danger to the public." Id. at 15. The court rested its holding that the statute was constitutional on "the existence of a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns." Id. at 12. However, because the line between childhood and adulthood was historically 21, not 18, the First Circuit's conclusion that there is a "longstanding tradition" of preventing persons under 18 from "receiving" handguns applies with just as much force to persons under 21.

To be sure, we are unable to divine the Founders' specific views on whether 18-to-20-year-olds had a stronger claim than 17-year-olds to the Second Amendment guarantee. The Founders may not even have shared a collective view on such a subtle and fine-grained distinction. The important point is that there is considerable historical evidence of age- and safety-based restrictions on the ability to access arms. Modern restrictions on the ability of persons under 21 to purchase handguns—and the ability of persons under 18 to possess handguns—seem, to us, to be firmly historically rooted.

Nonetheless, we face institutional challenges in conducting a definitive review of the relevant historical record. Although we are inclined to uphold the challenged federal laws at step one of our analytical framework, in an abundance of caution, we proceed to step two. We ultimately conclude that the challenged federal laws pass constitutional muster even if they implicate the Second Amendment guarantee.[17]

---

[17] Before we scrutinize the challenged federal laws, however, we address one final scope issue: Appellants' contention that a right to purchase firearms from FFLs must vest at age 18. Appellants offer two arguments in favor of this contention. We reject both.

Appellants first argue that 18-to-20-year-olds have a Second Amendment right to purchase firearms from FFLs because, at the time of the founding, 18-to-20-year-olds were assigned to serve in the militia and militia duty necessarily implies the right to purchase firearms. The 1792 Militia Act provided that "each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia." Militia Act § 1, 1 Stat. 271. But Appellants' militia-based attack on the federal laws at bar is unavailing. First, the right to arms is not co-

D.    Whether to Apply a More or Less Demanding Level of Scrutiny

Assuming that the challenged federal laws burden conduct within the scope of the Second Amendment, we must evaluate the laws under a suitable standard of constitutional scrutiny.  A law that burdens the core of the Second Amendment guarantee—for example, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," Heller, 554 U.S. at 635—would trigger strict scrutiny, while a less severe law would be proportionately easier to justify.  See Heller II, 670 F.3d at 1257; Masciandaro, 638 F.3d at 470; Chester, 628 F.3d at 682.  The latter, "intermediate" standard

extensive with the duty to serve in the militia.  See Heller, 554 U .S. at 589–94 (decoupling the former from the latter).  Second, if the right to arms and the duty to serve in the militia were linked in the manner that Appellants declare, then Appellants' argument proves too much.  In some colonies, able-bodied sixteen-year-olds were obligated to serve in the militia, and yet, Appellants assure us that they are not challenging restrictions on handgun possession by or sales to persons under age 18.  E.g., Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 62 (assigning to militia "every able bodied male person [with exceptions] from sixteen years of age to fifty").  Third, in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need.  Compare An Act for the Better Regulating [of] the Militia, ch. 20, §§1, 4, 1777 N.J. Acts 26 (setting minimum age at 16 in 1777), with An Act to embody, for a limited Time, One Thousand of the Militia of this State, for the Defence of the Frontiers thereof, ch. 24, §§ 3-4, 1779 N.J. Acts 58, 58-69 (setting minimum age at 21, but reserving right to accept age 16-21, in 1779).  Such fluctuation undermines Appellants' militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later.  Indeed, the 1792 Militia Act gave States discretion to impose age qualifications on service, and several States chose to enroll only persons age 21 or over, or required parental consent for persons under 21.  E.g., An Act to regulate the Militia, § 2, 1843 Ohio Acts 53, 53 (setting minimum age at 21).  And this is all not to mention the anachronism at play: we no longer have a founding-era-style militia.

Appellants also argue that a Second Amendment right to purchase firearms from FFLs vests at age 18 because the age of majority is now 18.  True, in the 1970s, States lowered the age of majority for most purposes from 21 to 18.  But "majority or minority is a status," not a "fixed or vested right."  Jeffrey F. Ghent, Statutory Change of Age of Majority as Affecting Pre-existing Status or Rights, 75 A.L.R. 3d 228 § 3 (1977).  The terms "majority" and "minority" lack content without reference to the right at issue.  Seventeen-year-olds may not vote or serve in the military, while 18-year-olds may.  Twenty-year-olds may not purchase alcohol (by state statute), purchase lottery tickets in some States (e.g., Ariz. Rev. Stat. §  5-515(a)), purchase handguns in some States (by state statute), or purchase handguns from FFLs (by federal statute)—while 21-year-olds may.  Neither the Twenty-Sixth Amendment nor state law setting the age of majority at 18 compels Congress or the States to select 18 as the minimum age to purchase alcohol, lottery tickets, or handguns.

of scrutiny requires the government to show a reasonable fit between the law and an important government objective.

Unquestionably, the challenged federal laws trigger nothing more than "intermediate" scrutiny. We have demonstrated that this federal scheme is not a salient outlier in the historical landscape of gun control. And unlike the D.C. ban in Heller, this ban does not disarm an entire community, but instead prohibits commercial handgun sales to 18-to-20-year-olds—a discrete category. The narrow ambit of the ban's target militates against strict scrutiny.

Indeed, Heller's observation that longstanding prohibitions on firearm possession by felons and the mentally ill are presumptively valid, 554 U.S. at 626, 627 n.26, entails that the Second Amendment permits "categorical regulation of gun possession by classes of persons." Booker, 644 F.3d at 23; see also Skoien, 614 F.3d at 640, 641 (inferring from Heller that "statutory prohibitions on the possession of weapons by some persons are proper" and noting that "[c]ategorical limits on the possession of firearms would not be a constitutional anomaly"). Like the federal bans targeting felons and the mentally ill, the federal laws targeting minors under 21 are an outgrowth of an American tradition of regulating certain groups' access to arms for the sake of public safety. Compare Kates & Cramer, 60 Hastings L.J. at 1360 (arguing that the founding generation sought to disarm the unvirtuous, including minor children, felons, and the mentally ill), with S. Rep. No. 90-1501, at 22 (1968) (stating that the purpose of the 1968 Act was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency"). To the extent that the ban on handgun sales to minors under 21 is analogous to longstanding, presumptively lawful bans on possession by felons and the mentally ill, see Heller, 554 U.S. at 626, 627 n.26, the ban at bar should trigger an "intermediate" level of scrutiny. Cf.

Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 358 (2009) ("Restrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny.").

Moreover, as with felons and the mentally ill, categorically restricting the presumptive Second Amendment rights of 18-to-20-year-olds does not violate the central concern of the Second Amendment. The Second Amendment, at its core, protects "law-abiding, responsible" citizens. See Heller, 554 U.S. at 635 (emphasis added). Congress found that persons under 21 tend to be relatively irresponsible and can be prone to violent crime, especially when they have easy access to handguns. See Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 197, 225 (1968) (referring to "emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior"); cf. Chester, 628 F.3d at 682–83 (applying intermediate scrutiny to 18 U.S.C. § 922(g)(9), the federal domestic-violence-misdemeanant firearm possession ban, and holding that misdemeanant-plaintiff's claimed "right to possess a firearm in his home for the purpose of self-defense" was "not within the core right identified in Heller—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense").

Granted, 18-to-20-year-olds may have a stronger claim to the Second Amendment guarantee than convicted felons and domestic-violence misdemeanants have. Culpable criminal conduct has not put 18-to-20-year-olds in the cross-hairs of the ban at bar. Still, unlike bans on felons, the mentally ill, and domestic-violence misdemeanants, this ban does not severely burden the presumptive Second Amendment rights of the targeted class's members. While the former bans extinguish the Second Amendment rights of the class members by totally preventing them from possessing firearms, this ban is not so extreme.

First, these federal laws do not severely burden the Second Amendment rights of 18-to-20-year-olds because they impose an age qualification on commercial firearm sales: FFLs may not sell handguns to persons under the age of 21. Far from a total prohibition on handgun possession and use, these laws

resemble "laws imposing conditions and qualifications on the commercial sale of arms," which Heller deemed "presumptively lawful." See 554 U.S. at 626–27 & n.26. It is not clear that the Court had an age qualification in mind when it penned that sentence, but to the extent that these laws resemble presumptively lawful regulatory measures, they must not trigger strict scrutiny.

Second, these laws do not strike the core of the Second Amendment because they do not prevent 18-to-20-year-olds from possessing and using handguns "in defense of hearth and home." See id. at 628–30, 635; cf. Heller II, 670 F.3d at 1255–58 (applying intermediate scrutiny to D.C. registration requirements that "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—the 'core lawful purpose' protected by the Second Amendment," but that do not "prevent[] an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose"). Under this federal regulatory scheme, 18-to-20-year-olds may possess and use handguns for self-defense, hunting, or any other lawful purpose; they may acquire handguns from responsible parents or guardians; and they may possess, use, and purchase long-guns. Accordingly, the scheme is sufficiently bounded to avoid strict scrutiny.

Third, these laws demand only an "intermediate" level of scrutiny because they regulate commercial sales through an age qualification with temporary effect. Any 18-to-20-year-old subject to the ban will soon grow up and out of its reach. It is useful to compare this case with United States v. Yancey, in which the Seventh Circuit held that 18 U.S.C. § 922(g)(3), the illegal-drug-user firearm possession ban, was "far less onerous" than the firearm-possession bans on felons and the mentally ill because "unlike those who have been convicted of a felony or committed to a mental institution and so face a lifetime ban, an unlawful drug user like [the defendant] could regain his right to possess a

firearm simply by ending his drug abuse." 621 F.3d 681, 686–87 (7th Cir. 2010). Similar logic applies here. The temporary nature of the burden reduces its severity. Consequently, we hold that these laws deserve what we have dubbed an "intermediate" level of scrutiny.

E.    Whether These Laws Survive "Intermediate" Scrutiny

In applying "intermediate" scrutiny, we determine whether there is a reasonable fit between the law and an important government objective; that is, the government must show that the law is reasonably adapted to an important government interest. See Marzzarella, 614 F.3d at 98; accord Chester, 628 F.3d at 683; see also Masciandaro, 638 F.3d at 470. We conclude that the challenged ban passes constitutional muster under "intermediate" scrutiny.

The government has put forth evidence that, through the 1968 Act, Congress sought to manage an important public safety problem: the ease with which young persons—including 18-to-20-year-olds—were getting their hands on handguns through FFLs. As discussed supra, Section III.B, Congress conducted a multi-year investigation that revealed a causal relationship between the easy availability of firearms to young people under 21 and the rise in crime. See Pub. L. No. 90-351, § 901(a)(6), 82 Stat. 197, 225–26 (1968) (identifying a "causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior"); id. § 901(a)(2), 82 Stat. at 225 (identifying "ease with which" young persons could "acquire firearms other than a rifle or shotgun" as a "significant factor in the prevalence of lawlessness and violent crime in the United States"). Indeed, at a hearing held in connection with Congress's inquiry, a law enforcement official reported, "The greatest growth of crime today is in the area of young people, juveniles, and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly." Federal Firearms Act: Hearings Before the Subcomm. to

33

Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 90th Cong. 57 (1967) (testimony of Sheldon S. Cohen).

The legislative record illustrates that Congress was concerned not only with "juveniles" under the age of 18, but also with "minors" under the age of 21. See S. Rep. No. 90-1097, at 79 (1968) ("The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country.") Congress's investigation had shown that "juveniles account for some 49 percent of the arrests for serious crimes in the United States," while "minors account for 64 percent of the total arrests in this category." S. Rep. No. 90-1097, at 77. Specifically, "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder. See 114 Cong. Rec. 12279, 12309 (1968) (statement of Sen. Thomas J. Dodd, Chairman, Sen. Subcomm. on Juvenile Delinquency).

The legislative record also demonstrates that Congress was particularly concerned with the FFL's role in the crime problem. The investigation had revealed that FFLs constituted the central conduit of handgun traffic to young persons. See Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the Sen. Comm. on the Judiciary, 89th Cong. 67 (1965) (testimony of Sheldon S. Cohen) ("The vast majority, in fact, almost all of these firearms, are put into the hands of juveniles by importers, manufacturers, and dealers who operate under licenses issued by the Federal Government . . . . The way to end this dangerous practice is to stop these federal licensees from selling firearms to juveniles and this is one of the major things that [the proposed legislation] would do."); Pub. L. No. 90-351, § 901(a)(6), 82 Stat. at 226 (finding that concealable firearms had been "widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior"); id. § 901(a)(3), 82 Stat. at 225 (concluding that "only

through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible").[18]

Additionally, the legislative record reflects Congress's concern with the "particular type of weapon that is predominantly used by the criminal" and that is "principally used in the commission of serious crime"—i.e., the "handgun." S. Rep. No. 89-1866, at 4–7 (1966). The handgun's size made it easy to carry and conceal, which in turn made it susceptible to "clandestine acquisition," S. Rep. No. 90-1097, at 79, and "criminal use," S. Rep. No. 89-1866, at 4.

Overall, the government has marshaled evidence showing that Congress was focused on a particular problem: young persons under 21, who are immature and prone to violence, easily accessing handguns, which facilitate violent crime, primarily by way of FFLs. Accordingly, Congress restricted the ability of young persons under 21 to purchase handguns from FFLs. See 18 U.S.C § 922(b)(1).

We find that the government has satisfied its burden of showing a reasonable means-ends fit between the challenged federal laws and an important government interest. First, curbing violent crime perpetrated by young persons under 21—by preventing such persons from acquiring handguns from FFLs—constitutes an important government objective. See, e.g., Schall v. Martin, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted.").

---

[18] See also Huddleston, 415 U.S. at 825 ("From this outline of the Act, it is apparent that the focus of the federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly controls access to weapons by users. Firearms are channeled through dealers to eliminate the mail order and the generally widespread commerce in them, and to insure that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest."); United States v. Rybar, 103 F.3d 273, 280 (3d Cir. 1996) ("[T]he Omnibus Act channeled [sic] all interstate traffic through licensees and prohibited licensees from transferring them to persons under 21 or living out-of-state.").

Second, Congress selected means that were reasonably adapted to achieving that objective. Congress found that the ease with which young persons under 21 could access handguns—as opposed to other guns—was contributing to violent crime, and also found that FFLs—as opposed to other sources—constituted the central conduit of handgun traffic to young persons under 21. Congress, in turn, reasonably tailored a solution to the particular problem: Congress restricted the ability of persons under 21 to purchase handguns from FFLs, while allowing (i) 18-to-20-year-old persons to purchase long-guns, (ii) persons under 21 to acquire handguns from parents or guardians, and (iii) persons under 21 to possess handguns and long-guns. See 18 U.S.C. § 922(b)(1), (c)(1); see also supra, Section I.B.[19]

Alternatively, Congress could have sought to prohibit all persons under 21 from possessing handguns—or all guns, for that matter. But Congress deliberately adopted a calibrated, compromise approach. See 114 Cong. Rec. at 12309 (Sen. Dodd) ("At the most [the relevant provisions] could cause minor inconveniences to certain youngsters . . . by requiring that a parent or guardian over 21 years of age make a handgun purchase for any person under 21."); see also S. Rep. 90-1097, at 79 (stating that "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor by the parent or guardian"); accord S. Rep. No. 89-1866, at 58.

Since 1968, the means-ends fit between the ban and its objective has retained its reasonableness. The threat posed by 18-to-20-year-olds with easy access to handguns endures. In 1999, for example, one senator noted:

---

[19] As discussed, it was not until 1994 that Congress prohibited persons under 18 from possessing handguns and prohibited transfers of handguns to them, with exceptions. See Pub. L. No. 103-322, § 110201, 108 Stat. 1796, 2010 (1994) (adding 18 U.S.C. § 922(x)).

Firearms trace data collected as part of the Youth Crime Gun Interdiction Initiative (YCGII) paint a disturbing picture of crime gun activity by persons under 21. In the most recent YCGII Trace Analysis Report, the age of the possessor was known for 32,653, or 42.8 percent, of the 72,260 crime guns traced. Of these 32,563 guns, approximately 4,840, or 14.8 percent, were recovered from 18-20 year-olds. Indeed, the most frequent age of crime gun possession was 19 years of age, and the second most frequent was 18 years of age.

At the same time, according to the 1997 Uniform Crime Reports, the most frequent age arrested for murder was 18 years of age, and the second most frequent was 19 years of age. Those aged 18-20 accounted for 22 percent of all arrest[s] for murder in 1997.

145 Cong. Rec. 7503 (1999) (statement of Sen. Charles Schumer); see also 145 Cong. Rec. 18119 (1999) ("Studies show that one in four gun murders are committed by people aged 18 to 20.") (statement of Rep. Grace Napolitano).

Furthermore, a 1999 report by the U.S. Department of Treasury and the U.S. Department of Justice found that "[i]n 1997, 18, 19 and 20 year olds ranked first, second, and third in the number of gun homicides committed":

Of all gun homicides where an offender was identified, 24 percent were committed by 18 to 20 year olds. This is consistent with the historical pattern of gun homicides over the past ten years.

Among murderers, 18 to 20 year olds were more likely to use a firearm than adults 21 and over. More specifically, in 1997, 74 percent of the homicides committed by 18 to 20 year old offenders involved firearms. In contrast, only 61 percent of homicides committed by offenders 21 or over involved firearms. The under-21 offender age groups showed a significant shift toward the use of firearms in committing homicides by the mid-1980's. By the 1990's, these offender groups were using firearms to commit homicides more than 70 percent of the time. Although the proportion of 18 to 20 year olds who use firearms to commit homicides has declined since the1994 peak, it remains higher than levels recorded before 1990. Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20 year old offenders were more likely to use guns than both younger and older offender age groups. For non-lethal crimes of violence from 1992 to 1997, in cases where the weapon and

age of offender were identified, 15 percent of 18 to 20 year old offenders used a firearm, in contrast to 10 percent of adult offenders, and 5 percent of offenders 17 and under.

U.S. Dep't of the Treasury & U.S. Dep't of Justice, Gun Crime in the Age Group 18–20, at 2 (June 1999) (citations ommitted); see also id. at 3 ("Handguns comprised 85 percent of the crime guns known to be recovered from 18 to 20 year olds" in twenty-seven cities participating in the study).

Recent data confirm that preventing handguns from easily falling into the hands of 18-to-20-year-olds remains critical to public safety. An FBI Uniform Crime Report for 2009 shows that persons aged 19, 18, and 20 accounted for the first, second, and third highest percentages of arrests, respectively, for any age up to age 24 (after which data are reported by age group). U.S. Dep't of Justice & Fed. Bureau of Investigation, Crime in the United States 2009, Table 38: Arrests by Age (Sept. 2010), http://www2.fbi.gov/ucr/cius2009/data/table_38.html (last visited Oct. 18, 2012) ("2009 CIUS Report") (reflecting: age 18 (4.8%); age 19 (5.0%); and age 20 (4.6%). In 2009, 18-to-20-year-olds accounted for over 19% of all murder and non-negligent manslaughter arrests, 14% of all arrests for forcible rape, almost 24% of all robbery arrests, and 12% of all aggravated assault arrests, see id., even though they comprised only about 4.3% of the population.[20, 21]

---

[20] The government in its summary judgment brief calculated the population figure by dividing the total estimated population in December 2009 for ages 18,19, and 20 (4,344,942 + 4,484,666 + 4,415,714) by the total estimated population for all ages in that month (308,200,409). See U.S. Census Bureau, Dep't of Commerce, Population Estimates: National Population Estimates for the 2000s (June 2010), http://www.census.gov/popest/data/national/asrh/2009/2009-nat-res.html (last visited Oct. 18, 2012); see also U.S. Census Bureau, Dep't of Commerce, Statistical Abstract of the United States: 2012, Table 11: Resident Population by Race, Hispanic Origin, and Single Years of Age: 2009 (131 ed. 2012), http://www.census.gov/compendia/statab/2012/tables/12s0011.pdf (last visited Oct. 18, 2012) (estimating the total population—as of July 1, 2009—as 307,007,000, and the population of persons aged 18, 19, and 20 as 4,389,000, 4,484,000, and 4,340,000, respectively, which yields a 4.3% population figure for 18-to-20-year olds).

The 2009 CIUS Report was not an aberration. Similar to the 2009 report, the 2010 CIUS Report shows that 18-, 19-, and 20-year-olds accounted for the three highest percentages

Nonetheless, Appellants counter that the emergence of unlicensed, private gun owners who are selling handguns to young adults undermines the reasonableness of the fit between the federal scheme and its objective. We decline Appellants' invitation to strike down these laws, under intermediate scrutiny, on the ground that they do not completely prevent young adults from accessing handguns and committing violent crimes. It is well-settled that "a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." Buckley v. Valeo, 424 U.S. 1, 105 (1976) (citations and internal quotation marks omitted). Congress designed its scheme to solve a particular problem: violent crime associated with the trafficking of handguns from FFLs to young adults. Because Congress's

---

of arrests for any age up to 24 (after which data are reported by age group); and, like the 2009 report, the 2010 report shows that 18-to-20-year-olds accounted for a disproportionately high percentage of arrests for violent crimes. See U.S. Dep't of Justice & Fed. Bureau of Investigation, Crime in the United States 2010, Table 38: Arrests by Age (Sept. 2011), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl39.xls (last visited Oct. 10, 2012) (reflecting: age 18 (4.6%); age 19 (4.9%); age 20 (4.7%)).

[21] We add that Congress's finding that minors under 21 are prone to violent crime, especially with guns-in-hand, is entitled to some deference. "Congress is far better equipped than the judiciary" to make "predictive judgments" and "amass and evaluate the vast amounts of data" bearing upon "complex" and "dynamic" issues. See Turner Broad. Sys. Inc. v. FCC, 512 U.S. 622, 665–66 (1994) (internal quotation marks omitted).

Furthermore, even putting aside deference, modern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over. See, e.g., Brief for the Am. Med. Ass'n et al. as Amici Curiae in Support of Neither Party, Miller v. Alabama, 132 S. Ct. 2455 (2012) (Nos. 10-9646, 10-9647), 2012 WL 121237, at 19–20 ("The brain's frontal lobes are still structurally immature well into late adolescence, and the prefrontal cortex is 'one of the last brain regions to mature.' This, in turn, means that 'response inhibition, emotional regulation, planning and organization . . . continue to develop between adolescence and young adulthood.'" (citations omitted)); Lawrence Steinberg et al., Age Differences in Future Orientation and Delay Discounting, 80 Child Dev. 28, 40–41 (2009) ("[C]hanges in impulse control and planning are mediated by a 'cognitive control' network . . . which matures more gradually and over a longer period of time, into early adulthood.").

intended scheme reasonably fits that objective, the ban at bar survives "intermediate" scrutiny.

*       *       *

We therefore hold that the challenged federal laws are constitutional under the Second Amendment.  Heller does not cast doubt on them.

## IV.  Equal Protection Claim

We also reject Appellants' contention that the ban violates the equal protection component of the Fifth Amendment.  "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar advantage of a suspect class." Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976).  First, we have demonstrated that the challenged laws do not impermissibly interfere with Second Amendment rights.  Second, "age is not a suspect classification."  Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 83 (2000).

Unlike race- or gender-based classifications, which require a "tighter fit between the discriminatory means and the legitimate ends they serve," the government may "discriminate on the basis of age without offending" the constitutional guarantee of equal protection "if the age classification in question is rationally related to a legitimate state interest."  Id. at 83–84.  "[W]hen conducting rational basis review," a court "will not overturn" the legislation "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational."  Id. at 84 (internal quotation marks and alterations omitted).  "[B]ecause an age classification is presumptively rational, the individual challenging its constitutionality bears the burden of proving the facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."  Id. at 84 (internal quotation marks omitted).

For the same reasons that the challenged laws are reasonably adapted to an important state interest, see supra Section III.E, the laws are rationally related to a legitimate state interest.  Appellants have failed to show that Congress irrationally imposed age qualifications on commercial arms sales.

AFFIRMED.